WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Delta Zee Solutions LLC,<br><br>Plaintiff,<br><br>v.<br><br>Britannia Tucson LLC, et al.,<br><br>Defendants. | No. CV-25-00414-TUC-AMM (MSA)<br><br>**REPORT AND RECOMMENDATION** |

Before the Court is Plaintiff Delta Zee Solutions' motion for declaratory judgment, which the Court will construe as a motion for judgment on the pleadings. So construed, the motion is suitable for decision without oral argument. The Court will recommend that the motion be denied.

## Background[1]

Defendant Britannia Tucson LLC owns commercial property in Tucson, Arizona. (Doc. 14, ¶¶ 13–16; Doc. 16, ¶¶ 13–16.) In August 2024, Defendant and Plaintiff entered into an agreement for Plaintiff to lease the property (the Lease). (Doc. 18, ¶ 10.) The Lease includes a standard form agreement (Paragraphs 1 through 49) and an addendum drafted by the parties (Paragraphs 50 through 61). (Doc. 18, ¶ 11; Doc. 14-1.) Relevant here, Paragraph 2.2 required that Defendant "deliver" possession of the "Premises" to Plaintiff

---

[1] For purposes of a motion for judgment on the pleadings, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mut. Life Ins.*, 727 F.2d 1480, 1482 (9th Cir. 1984)).

1  "on the Commencement Date or the Early Possession Date, whichever first occurs ('Start
2  Date')." (Doc. 14-1, ¶ 2.2) Paragraph 1.3 defines "Commencement Date" as "January 1,
3  2025." (*Id.* ¶ 1.3.) Paragraph 51 provided that the "start date of the lease" would "be
4  adjusted to reflect the true date of commencement" if there were delays in construction.
5  (*Id.* ¶ 51.) Finally, Paragraph 3.3 provided that, if Defendant failed to deliver possession
6  within 120 days after the Commencement Date, the "Lease shall terminate unless other
7  agreements are reached . . . in writing." (*Id.* ¶ 3.3.)

8      In commercial leasing, the landlord ordinarily performs its improvement work on
9  the premises before turning the premises over to the tenant; and upon receipt of possession,
10 the tenant then performs its improvement work. (Doc. 18, ¶ 25.) Here, at Plaintiff's request,
11 Defendant agreed to perform the landlord and tenant work simultaneously. (*Id.* ¶¶ 26–27.)
12 After executing the Lease, Defendant immediately retained an architect. (*Id.* ¶ 28.) The
13 architect repeatedly asked Plaintiff about its requirements for the Premises, but Plaintiff
14 failed to timely respond. (*Id.* ¶¶ 33–34.) Plaintiff also repeatedly changed its specifications
15 for the Premises. (*Id.* ¶ 35.) Plaintiff's conduct resulted in months of delay. (*Id.* ¶¶ 34–60.)

16     The City of Tucson issued building permits on April 23, 2025. (*Id.* ¶ 61.) Thereafter,
17 Defendant called Plaintiff to discuss cost allocation for the tenant improvements. (*Id.* ¶ 62.)
18 On May 1, Plaintiff's officer responded that he wanted to wait for the final plans before
19 allocating costs. (*Id.* ¶ 64.) On May 6, Plaintiff's officer told Defendant that Plaintiff was
20 not responsible for any HVAC costs, as the system had been overengineered and had too
21 many units. (*Id.* ¶ 65.) On May 8, Defendant sent an email about the HVAC work, and
22 Plaintiff's officer answered that he would respond "as soon as possible." (*Id.* ¶¶ 68–70.)
23 Plaintiff did not respond further regarding the HVAC system. (*Id.* ¶¶ 70–74.) Plaintiff did,
24 however, move personal property into, and installed equipment on, the Premises during
25 May and June 2025. (*Id.* ¶¶ 92–93.)

26     Notwithstanding the foregoing, on June 12, Plaintiff sent a letter to Defendant,
27 asserting for the first time that the Lease had terminated automatically on May 1. (*Id.* ¶ 83.)
28 Specifically, Plaintiff asserted that Paragraph 3.3's automatic termination provision was

triggered when Defendant failed to deliver possession of the Premises within 120 days of the Commencement Date of January 1, as defined in Paragraph 1.3. (*Id.* ¶¶ 84–85.) Defendant, believing that the Commencement Date had "adjusted" under Paragraph 51 due to delays in construction, replied by sending Plaintiff a notice of default. (*Id.* ¶¶ 86, 94.) When Plaintiff failed to cure its default, Defendant followed up with a notice that it had elected to terminate the Lease. (*Id.* ¶¶ 95–99.)

In this lawsuit, each party sues the other for breach of contract (among other things), and each seeks a declaratory judgment concerning the effect of the automatic termination provision in Paragraph 3.3. (Doc. 14, ¶¶ 118–21; Doc. 18, ¶¶ 107–12.) Plaintiff filed the currently pending motion for declaratory judgment, requesting that the Court interpret the Lease expeditiously so as to narrow and streamline discovery. (Docs. 30, 31.)

## Discussion

### I. The motion will be construed as a motion for judgment on the pleadings.

There are two threshold procedural disputes. First, Defendant argues that there is no such thing as a motion for declaratory judgment. Plaintiff responds that it "does not waive, and expressly reserves, any future argument that its Motion for Declaratory Judgment does not require an underlying procedural basis and may proceed independently." (Doc. 36, ¶ 4.) Nevertheless, Plaintiff agrees that the Court may treat the motion as one for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (*Id.* ¶¶ 2–3.)

Defendant is correct that "a party may not make a *motion* for declaratory relief" because "such a motion is inconsistent with the Federal Rules." *Kam-Ko Bio-Pharm Trading Co. v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) (quoting *Int'l Bhd. of Teamsters v. E. Conf. of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995)). So, the Court will follow Plaintiff's suggestion to construe the motion as one for judgment on the pleadings under Rule 12(c). *See id.* ("The district court thus properly construed Kam-Ko's 'motion' for declaratory judgment as a motion for summary judgment on Kam-Ko's 'action' for declaratory judgment.").

Second, Defendant argues that Plaintiff's Rule 12(c) motion is improper because it

seeks to resolve less than an entire claim. (Def.'s Resp. 4–5.) Defendant argues further that Plaintiff's "claim" of declaratory relief is not a claim at all; it is a remedy tied to Plaintiff's claim of breach of contract and thus not suited for decision under Rule 12(c). (*Id.* at 5.) Plaintiff responds that a standalone claim for declaratory relief is appropriate under 28 U.S.C. § 2201, and that its motion properly seeks to resolve the entirety of its claim for such relief. (Pl.'s Reply 8–9.) Nonbinding caselaw suggests that it is proper to decide a "claim" for declaratory relief under Rule 12(c). *See Marks v. UMG Recordings, Inc.*, No. 24-1756, 2025 WL 1121645, at *1 (9th Cir. Apr. 16, 2025) (affirming the district court's grant of judgment on the pleadings on a party's "claim for declaratory relief"). For that reason, and because Plaintiff is not entitled to judgment at this point anyway, the Court will proceed to the merits of the motion.

As a final matter, Plaintiff says that its motion is not a "conventional Rule 12(c) motion challenging the sufficiency of the pleadings independent of the request for declaratory relief." (Pl.'s Reply 2.) Plaintiff requests leave to amend its motion "[t]o the extent the Court were to conclude that any procedural adjustment or clarification is required." (*Id.* at 3.) It is not clear what Plaintiff means in stating that its motion is not a "conventional Rule 12(c) motion." The motion is being construed as a Rule 12(c) motion, so the Rule 12(c) standard applies. *See Kam-Ko*, 560 F.3d at 943 (construing the motion for declaratory relief as a motion for summary judgment and thus applying the summary-judgment standard). As explained below, under the Rule 12(c) standard, there is a factual dispute regarding the parties' contractual intent that precludes judgment on the pleadings.

## II.     Plaintiff is not entitled to judgment on the pleadings.

A Rule 12(c) motion is subject to a similar standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (quoting *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)). This standard requires that "the allegations of the non-moving party . . . be accepted as true," and that "the allegations of the moving party which have been denied [be treated as] false." *Hal Roach Studios, Inc. v. Richard Feiner*

    *& Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mut. Life Ins.*, 727 F.2d 1480, 1482 (9th Cir. 1984)). It further requires that the facts be "construed in the light most favorable to [the nonmoving] party." *Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 700 (9th Cir. 2022) (quoting *Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989)). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Health Freedom Def. Fund, Inc. v. Carvalho*, 148 F.4th 1020, 1026 (9th Cir. 2025) (en banc) (quoting *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009)).

    Here, Plaintiff's motion for judgment on the pleadings seeks an interpretation of the Lease. The Lease is governed by the law of the state in which the Premises are located, so Arizona law applies. (Doc. 14-1, ¶ 29.) In Arizona, "[t]he purpose of contract interpretation is to determine the parties' intent and enforce that intent." *Roe v. Austin*, 433 P.3d 569, 574 (Ariz. Ct. App. 2018) (quoting *Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009)). In determining contractual intent, the court generally starts with "the plain meaning of the words in the context of the contract as a whole." *Worldwide Jet Charter, Inc. v. Toulatos*, 523 P.3d 398, 401 (Ariz. Ct. App. 2022) (quoting *Grosvenor*, 218 P.3d at 1050). But the court may also "consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct." *Taylor v. State Farm Mut. Auto Ins.*, 854 P.2d 1134, 1139 (Ariz. 1993) (citing *Darner Motor Sales, Inc. v. Universal Underwriters Ins.*, 682 P.2d 388, 398 (Ariz. 1984)). The court may consider extrinsic evidence of the parties' intent when the "contractual language is reasonably susceptible to the interpretation asserted by the proponent of the evidence." *Starr Pass Resort Devs., LLC v. Pima County*, 550 P.3d 1111, 1120 (Ariz. Ct. App. 2024). This is true even when the contractual language seems unambiguous. *Taylor*, 854 P.2d at 1140 ("The meaning that appears plain and unambiguous on the first reading of a document may not appear nearly so plain once the judge considers the [extrinsic] evidence."). When a contract is "susceptible to more than one interpretation," the issue of contractual intent "should be submitted to the

jury." *State v. Mabery Ranch, Co.*, 165 P.3d 211, 219 (Ariz. Ct. App. 2007) (citing *Taylor*, 854 P.2d at 1145).

Under these standards, Plaintiff's motion must be denied if there is a material factual dispute concerning the parties' contractual intent. *See Unite Here Local 30*, 35 F.4th at 700 (stating that judgment is proper only when "there is no issue of material fact" (citing *Fleming*, 581 F.3d at 925)); *Taylor*, 854 P.2d at 159 (holding that the parties' contractual intent was an issue of fact for the jury). As explained below, Defendant has shown the existence of such a dispute by offering a competing interpretation to which the Lease is reasonably susceptible, and which is supported by the surrounding circumstances.

The parties' disagreement centers on Paragraphs 1.3 and 3.3 of the form contract and Paragraph 51 of the addendum. Paragraph 1.3, titled "Term," defines "Commencement Date" as "January 1, 2025," and further directs the reader to "*see P 51." (Doc. 14-1, ¶ 1.3) Paragraph 51 provides:

> **51. Paragraph 1.3 Term, continued.** If the substantial completion of construction, as outlined in Paragraph 57 below, is not complete by December 31, 2024 and [Plaintiff] is not able to move into the Premises, then the start date of the lease shall be adjusted to reflect the true date of commencement. In such case, the parties shall execute an Addendum to the Lease regarding the new commencement date and the related changes to the Base Rent schedule as shown in paragraph 53, below.

(*Id.* ¶ 51.)

Paragraph 3.3 provides, in relevant part:

> **3.3 Delay In Possession.** [Defendant] agrees to use commercially reasonable efforts to deliver exclusive possession of the Premises to [Plaintiff] by the Commencement Date. . . . If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, [Plaintiff] may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by [Defendant] within said 10 day period, [Plaintiff's] right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between [Defendant] and [Plaintiff], in writing.

1  (*Id.* ¶ 3.3.)

2  According to Plaintiff, Paragraph 1.3 fixed the Commencement Date on January 1, 2025, and Paragraph 3.3 set an outside deadline of 120 days from that date (May 1, 2025) for Defendant to deliver possession. (Pl.'s Mot. 7.) Plaintiff says that Paragraph 51 has no effect on this scheme; rather, it allows the parties "to adjust the rent-commencement date and the start of the Lease term if construction delays the date of exclusive possession." (*Id.* at 9.) Stated differently, Plaintiff asserts that "Paragraph 51 governs rent and term calculation—not delivery deadlines." (*Id.*) If this is correct, then the Lease automatically terminated on May 1, when Defendant failed to deliver possession. (*Id.* at 11.)

Defendant offers a different interpretation. Defendant says that Paragraph 1.3 set the Commencement Date on January 1, 2025, *unless* the improvements to the Premises were not completed and Plaintiff could not take possession. (Def.'s Resp. 7.) In that case, Defendant says, Paragraph 51 provided that the Commencement Date would be "adjusted to reflect the true date of commencement," and the 120-day deadline set in Paragraph 3.3 would necessarily adjust as well. (*Id.*)

To start, the Lease is reasonably susceptible to Defendant's interpretation. Indeed, in a comparison with Plaintiff's, Defendant's is the more natural reading. Paragraph 1.3, titled "Term," defines "Commencement Date." Paragraph 51, titled "Paragraph 1.3 Term, continued" provides that "the start date of the lease shall be adjusted to reflect the true date of commencement." Because Paragraph 51 is an express continuation of the subject matter of Paragraph 1.3, the most natural reading is that Paragraph 51 provides for adjustment of what is defined in Paragraph 1.3. Further, Paragraph 3.3 fits easily into this straightforward reading: the 120-day deadline is measured from the Commencement Date, whether as originally defined in Paragraph 1.3 or as adjusted under Paragraph 51.

In addition, since the Lease is reasonably susceptible to Defendant's interpretation, extrinsic evidence supporting that interpretation would be admissible. While there is no evidence in the record to consider, Defendant's factual allegations are the equivalent of evidence given that the Court is bound to accept them as true. Defendant alleges that, *after*

1  May 1, Plaintiff discussed construction costs with Defendant, moved personal property
2  onto the Premises, and installed equipment on the Premises. (Doc. 18, ¶¶ 64–65, 92–93.)
3  Such conduct suggests that Plaintiff understood that January 1 was not set in stone as the
4  Commencement Date. Thus, the surrounding circumstances support Defendant's assertion
5  that the parties intended Paragraph 51 to adjust the Commencement Date from January 1
6  for all purposes, including delivery of possession. *See Taylor*, 854 P.2d at 1143 ("State
7  Farm's subsequent conduct may shed light on its understanding of what was covered by
8  the agreement.").

9  Defendant's interpretation is supported by the contractual language and surrounding
10 circumstances. Thus, assuming that the Lease is also reasonably susceptible to Plaintiff's
11 interpretation, there is a material dispute as to the parties' contractual intent. This precludes
12 judgment on the pleadings. *See Mabery Ranch, Co.*, 165 P.3d at 224 ("Where interpretation
13 of a contract is needed because its terms are reasonably susceptible to different meanings,
14 the matter should be submitted to the jury." (citing *Taylor*, 854 P.2d at 1145)).

15 Plaintiff challenges Defendant's reading on several grounds, but none is persuasive.
16 Plaintiff first argues that Defendant's interpretation "nullifies" and "erases" Paragraph 3.3.
17 (Pl.'s Mot. 8–9.) That is, according to Plaintiff, Defendant could move the Commencement
18 Date "indefinitely" until it "elects to deliver possession," such that "the 120-day outside
19 deadline in Paragraph 3.3 never begins." (*Id.* at 8.) But this is not a realistic concern. The
20 landlord's benefit from a rental agreement is rent (obviously). Here, rent would not be paid
21 until two months after Plaintiff took possession. (Doc. 14-1, ¶¶ 1.5, 53.) Plaintiff does not
22 explain, nor is it apparent to the Court, why Defendant would ever choose to intentionally
23 delay its receipt of rent. In any event, the Lease requires performance within a reasonable
24 time. (*Id.* ¶¶ 3.3, 13.6(a).) In addition, as Defendant explains, state law implies a duty to
25 perform within a reasonable time, and the covenant of good faith and fair dealing requires
26 that discretion not be exercised in a way that deprives the other party of its reasonable
27 expectations. (Def.'s Resp. 11–12.) In short, Defendant was required and incentivized to
28 bring about the Commencement Date within a reasonable time. As that would start the 120-

- 8 -

day deadline in Paragraph 3.3, it simply is not true that Defendant's reading "nullifies" and "erases" that deadline.

Plaintiff next argues that Defendant's interpretation "produces an incoherent and commercially unreasonable result" because it effectively changes the Lease to read "[i]f possession is not delivered within 120 days *after the date the Lessor decides the Lessee may take possession*, this Lease shall terminate." (Pl.'s Mot. 9.) This is the same argument discussed above. It is not persuasive. Plaintiff adds that its own interpretation "preserves commercial predictability," and that it "bargained for a space it needs to conduct its business, not the uncertainty that [Defendant] alleges is created by Addendum paragraph 51." (*Id.* at 7, 9.) "Arizona law does not adopt interpretations that allow one party to unilaterally delay its performance indefinitely or that produce absurd or commercially unreasonable results," Plaintiff says. (*Id.* at 9.)

Plaintiff's point about commercial workability and predictability would hold more weight had the parties not deviated from commercial practice in a material way. The customary practice is for the landlord and tenant work to be completed in series, not at the same time. (Doc. 18, ¶ 25.) That is, the landlord completes its work; the landlord then turns over possession to the tenant; and the tenant then completes its work. (*Id.*) In that scenario, it makes perfect sense to hold the landlord to a 120-day deadline; after all, the tenant can do nothing but wait for the landlord to complete its work and deliver possession. Here, though, Defendant agreed to Plaintiff's request that the landlord and tenant work be performed at the same time. (*Id.* ¶¶ 26–27.) Defendant's interpretation of Paragraph 51 is logical in this context. Plaintiff's work surely would have *some* effect on Defendant's ability to complete its work. So, it makes sense that the parties would reach an agreement that would not leave Defendant exposed in the event that Plaintiff was dilatory or otherwise obstructive. As read by Defendant, Paragraph 51 does just that by adjusting the Commencement Date based on the progress of the landlord *and* tenant work and Plaintiff's resultant ability to move into the Premises. (Def.'s Resp. 7–8.)

Plaintiff argues next that its interpretation is supported by the fact that Paragraph 51

1  does not mention "termination, outside deadlines, or delivery of possession." (Pl.'s Mot. 9.)
2  But why should it? Those topics are addressed in Paragraph 3.3. As previously explained,
3  Paragraph 1.3 defines the start point of the Lease term. Paragraph 51 is a continuation of
4  Paragraph 1.3, providing that the start point would be adjusted under certain circumstances.
5  These linked provisions determine the "termination, outside deadlines, [and] delivery of
6  possession" issues within the meaning of Paragraph 3.3. Read this way, the provisions are
7  in harmony. Plaintiff's assertions to the contrary are not persuasive. (*See id.* at 9–10 (stating
8  that Defendant's reading makes Paragraph 51 "override" Paragraph 3.3 and "subordinates"
9  Paragraph 3.3 to Paragraph 51).)

10  Plaintiff highlights that Paragraph 1.3 defines the term "Commencement Date"
11  (capitalized), while Paragraph 51 uses the terms "date of commencement" and "new
12  commencement date" (uncapitalized). (Pl.'s Reply 5.) Plaintiff argues that this distinction
13  shows that Paragraph 51 does not "redefine the capitalized term 'Commencement Date.'"
14  (*Id.*) And since Paragraph 3.3 *does* use the capitalized term, Plaintiff argues that the Court
15  must apply the capitalized definition set forth in Paragraph 1.3 ("January 1, 2025"). (*Id.*)

16  It is true that parties can use capitalization to alter the meaning of a word, and that
17  use of the same word in lowercase can signal a different meaning. *See Horton v. Mitchell*,
18  29 P.3d 870, 874 (Ariz. Ct. App. 2001) (quoting *Chandler Med. Bldg. Partners v. Chandler*
19  *Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993)). However, this rule is not absolute,
20  and there is good reason here to think that Paragraph 51 does not refer to a commencement
21  date separate from the one defined in Paragraph 1.3: the addendum, which was drafted by
22  the parties, is brimming with capitalization and other drafting inconsistencies. For instance,
23  while the form contract defines the capitalized term "Lease," that word appears in the
24  addendum capitalized *and* in lowercase—with both versions appearing in Paragraph 51.
25  (*See* Doc. 14-1, ¶ 51 ("the lease" and "the Lease").) While the form contract defines the
26  122-month lease period as the "Original Term," the addendum refers to that period as the
27  "original Lease Term" and "lease term." (*Id.* ¶¶ 1.3, 56, 60.) Similarly, the addendum gives
28  Plaintiff an option to extend the Original Term for an "additional consecutive period of

1  five (5) years" and defines that period as the "Option Term"—and then immediately
2  ignores that defined term, referring to the five-year period as the "Option period."
3  (*Id.* ¶ 56.)[2] In this ocean of scrivener carelessness and oversight, Plaintiff has not convinced
4  the Court that Paragraph 51's use of lowercase words is meaningful.

5  Plaintiff next argues that Defendant errs in focusing on Paragraph 51, because that
6  "provision is by it[s] express terms a continuation of Paragraph 1.3, *not* Paragraph 3.3."
7  (Pl.'s Reply 4.) Plaintiff places significance on the fact that nothing "show[s] that
8  Paragraph 3.3 was ever continued or amended." (*Id.*) But why does that matter? The Lease
9  must be read as a whole. *Toulatos*, 523 P.3d at 401 (quoting *Grosvenor*, 218 P.3d at 1050).
10 Paragraph 3.3 creates obligations tied to to the "Commencement Date," and the meaning
11 of "Commencement Date" is determined under Paragraph 1.3 and Paragraph 51. As has
12 already been stated, these provisions can be read in harmony.

13 Next, Plaintiff says that Defendant's reading "turns the Lease inside out" because it
14 "treat[s] substantial completion of construction as the trigger for the Lease term and rent
15 schedule under Paragraph 51, while treating delivery of exclusive possession as a separate
16 obligation that may occur later—so long as it occurs sometime within 120 days after
17 substantial completion." (Pl.'s Reply 4.) Plaintiff argues that it cannot be that the Lease
18 "allow[s] the tenant's core benefit—exclusive possession—to float independently." (*Id.*)
19 This argument is difficult to understand. Even under Plaintiff's interpretation, "delivery of
20 exclusive possession [is] a separate obligation that may occur [after the Commencement
21 Date]." The clock would start on January 1, but Defendant could deliver possession at any
22 point thereafter before May 1. Thus, under both sides' interpretations, exclusive possession
23 "float[s] independently." As phrased, Plaintiff's point is not clear.

24 Plaintiff finally argues that "if 'Commencement Date' is redefined to mean the

---

[2] More: the addendum is inconsistent in its use of the defined term "Base Rent." (*See* Doc. 14-1, ¶ 53 ("Base rent"), ¶ 56 ("base rent").) The form contract uniformly capitalizes "Paragraph" when referencing other provisions, but the addendum uses it capitalized and in lowercase. (*See id.* ¶ 51 ("Paragraph 57 below" and "paragraph 53, below").) And while the form contract defines Plaintiff as "Lessee," the addendum uses "Lessee," "the Lessee," "Delta Zee Solutions," "Tenant," and "tenant"—frequently switching between terms in the same paragraph. (*See id.* ¶¶ 55–56, 58.)

eventual date [Plaintiff] can move in (or substantial completion plus move-in), then Paragraph 3.3 measures 'delay' by reference to its own endpoint. The 60-day option and 120-day termination clause cease to be meaningful protections because the clock never starts until possession is delivered." (Pl.'s Reply 6.) This argument misstates Defendant's position. As noted, the Commencement Date could occur before delivery of possession. In that case, the deadlines would operate as intended.

One last matter: Defendant raises three arguments not addressed above as to why Plaintiff is not entitled to declaratory relief. These arguments are easily dispensed with. First, Defendant argues that to the extent Paragraph 3.3 and Paragraph 51 conflict, the Court should apply the canon favoring written terms over form terms. (Def.'s Resp. 10.) As explained above, the Court agrees with Defendant that those provisions can be read in harmony. Second, Defendant argues that even if Plaintiff is correct "that the Commencement Date is fixed at January 1, 2025, the automatic termination provision in Paragraph 3.3 applies 'unless other agreements are reached,'" and the parties here "reached another agreement—the Addendum." (*Id.*) On this, Plaintiff is correct. The addendum is not an "other agreement"; it is part of the Lease itself. (Pl.'s Reply 7; Doc. 14-1, ¶ 1.12.) Third, Defendant argues that its defense of tenant-caused delay precludes Plaintiff from obtaining declaratory relief. (Def.'s Resp. 14–15.) Here again, Plaintiff is correct. Plaintiff seeks an interpretation of the Lease, not a declaration that the Lease in fact terminated on May 1. (Pl.'s Reply 9–10.) So, Defendant could prevail on its defense even if Plaintiff were granted declaratory relief.

\* \* \*

Plaintiff repeatedly asserts that interpretation of the Lease is a question of pure law, but Defendant has shown that there is a material factual dispute as to the parties' contractual intent. Judgment on the pleadings is therefore inappropriate.

## Conclusion

The Court recommends that Plaintiff's motion for declaratory judgment, which the Court construes as a motion for judgment on the pleadings (Doc. 30), be **denied**.

1   This recommendation is not immediately appealable to the United States Court of
2   Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections
3   with the district court. Fed. R. Civ. P. 72(b)(2). The parties have 14 days to file responses
4   to objections. *Id.* The parties may not file replies on objections absent the district court's
5   permission. A failure to file timely objections may result in the waiver of de novo review.
6   *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 9th day of January, 2026.

_____
Honorable Maria S. Aguilera
United States Magistrate Judge